OPINION ORDER DENYING MOTION TO RECUSE
ANITA DUPRIS, Chief Judge.
SUMMARY
On April 8, 2002 Plaintiffs Seidel and Strickland filed a Motion to Recuse Chief Judge Anita Dupris based on Canon Two of the Mohegan Tribe’s Judicial Code of Conduct[1], which provides statutorily defined minimum standards and guidance to the Mohegan judges on appropriate behavior as judges of the Mohegan Tribe. This is a question of first impression.
This Motion came before the Court for a hearing on April 16, 2002. The Plaintiffs, Bethany Seidel and Kimberly Strickland, were represented by Christopher Abeita, spokesman. The Defendant’s, Mohegan Tribal Council of Elders, were represented by Helen Avalos, spokesman. The Mohegan Tribal Council, Mark Brown and Sandra Eicheiberg appeared specially through their spokesmen, Dale White and Henry Buffalo, Jr. Third Party Defendant, Bethany Seidel, in her official capacity as Chairman of the Mohegan Tribal Election Committee, was represented by Andrew Houlding, spokesman.
APPLICABLE CANONS OF JUDICIAL CODE OF CONDUCT
The Canons state, among other things, that a Mohegan Judge must approach cases with the goals of promoting harmony, order, fair play, leadership and guidance to the parties without the use of coercion. Restitution is recognized as a tradition of the Mohegan Tribe, and is to be encouraged by the judge.[2]
Canon Two [3] states:
Mohegan tribal members expect those who make decisions about their lives and future to be wise and completely independent, and that the Court will decide without regard to improper influences. Personal influences may arise from family, personal, or business relationships; a personal interest in the case before the Court; giving in to or fearing political influence; or any consideration other than the equality of the parties and the merits of the case. Therefore, all Judges must remain personally impartial and independent, and act to promote and protect the independence of the Mohegan Tribal Court.
*475 Canon Three [4] states:
Automatic recusal is not required because of personal opinion, but only an aware and deliberate self-examination, with a moral judgment that it would be inappropriate to hear the cases. The Judge shall enter an order of recusal if it appears that bias or prejudice toward a person, group, or entity may play a part in the decision.... A Judge shall perform the duties of judicial office without bias, prejudice, or favoritism. If a Judge bears either a bias or favoritism toward any group, he should consciously reflect whether the attitude would affect the ability to remain impartial, given the identity of a party or parties before the Court.
RELEVANT FACTS
Plaintiffs base their motion on an affidavit of Mr. Kurt Eichelberg, a person not a party to this action. He is related to Ms. Sandra Eichelberg, a person who has, through her spokesman, filed a Motion to Dismiss a Cross-Claim brought against her by the Defendants to this action based on lack of personal jurisdiction.[5]
First the following are the specific allegations put on record by the parties through affidavits filed on the Motion to Recuse:
1)Mr. Kurt Eichelberg alleges he was listening outside my office door one day in May, 2001 to a conversation transpiring between Chairwoman Gay Story Hamilton and myself.
2) He further alleges that Chairwoman Hamilton discussed tribal enrollment issues with me, even after I allegedly stated “we probably shouldn’t be discussing these issues.”
3) Mr. Eichelberg alleges he was astonished that I allowed the conversation to continue anyway.
4) Mr. Eichelberg alleges he heard Chairwoman Hamilton tell me how she was depressed about enrollment. [I assume he meant enrollment issues.]
5) After listening outside my door for an undisclosed period of time, Mr. Ei-chelberg alleges he went into Ms. Eiehelberg’s office. On his way out of Ms. Eiehelberg’s office he stated . he again observed Chairwoman Hamilton in my office.[6]
6) Chairwoman Hamilton has filed an affidavit alleging she does not recall the visit nor the conversation.
Second, the following is a candid disclosure on my part of my contacts and interactions with all those involved or potentially involved in this matter, as required by my judicial oath, the Canons of Judicial Conduct, and my experience:
1) I have been Chief Judge of the Mohegan Tribe for almost two years. I come from an extensive background of judging in both trial and appellate court systems for nine (9) otter tribal courts in the United States.
2) In each tribe with which I worked, 1 have taken it upon myself to not *476 only be aware of the Constitution and statutory laws, but of the cultures of the Tribes. None are exactly alike.
3) In my quest to learn about the Mohegan Tribe, I have talked with many people who work for the tribe, as well as tribal members who don’t work for the Tribe.
4) I learned that the unique Constitution of the Mohegan Tribe establishes two Councils that “govern” the Tribe: the Tribal Council and the Council of Elders. The Constitution then imbues the Council of Elders with both legislative and judicial powers.
5) The Canons 'instruct judges to, inter alia, consult with the Council of Elders on matters of custom and tradition.
6) In the past two (2) years all of the Mohegan Tribal Trial Court judges and staff embarked on several projects to improve the Court’s services. We established ad hoe judicial committees with the other judiciary of the Tribe, i.e. the Council of Elders. The Court of Appeals judges were not appointed during this time. The Committees developed court rules of procedure, a written bar exam, and proposed peacemaker forum procedures. We all met regularly throughout 2000-2001.
7) During this period of time all of the Court staff, including all of the judges, discussed custom and tradition with the Council of Elders.
8) Throughout the same time and to the present we were also presented with culture training offered by the Tribe’s Museum Authority Director, Melissa Tantaquidgeon on two (2) separate occasions.
9) Throughout my two (2) years here I have meet several times with the statutorily-established Judiciary Committee, consisting of the Chief of Staff, the lead attorney for the Office of the Legal Department, and the Director of the Human Resources Department.
10) I have had regular meetings with the Chief of Staff on court administration issues.
11) I have had conversations with Ms. Sandra Eichelberg, who’s office is next to mine.
12) I have mingled in the lunchroom and at the Mohegan Wigwam Festival with several other tribal staff and tribal members.
13) I have had discussions with each of the members of the Council of Elders not directly related to custom and tradition. In fact, I was privileged to briefly visit Gladys Tanta-quidgeon, the medicine woman, with Elder Gilman shortly after I took the bench here.
14) I often have non-case related conversations with Dale White.
15) During the pendency of this case, and a prior case involving the Council of Elders, I have not had meetings with, nor social gatherings with any member of the Council of Elders.
16) I have discussed this case with no one, neither a party nor any tribal member. I have kept my own counsel in the matter.
17) The point of stating all of these contacts is this: it is my belief that in order to be a good judge for a tribal community, one must know the community. One must fit in. This is not an instant process, nor am I naive to believe everyone likes me. *477 That is not an issue, nor a quest of mine.
ISSUE
The true question is: from all my contacts with all the Mohegan members I have met, have my past relationships with any of them affected my ability to be fair and impartial in this matter? Do they give an appearance of impropriety?
APPLICABLE LAW
Neither party has given me legal guidance in this matter. I have reviewed other tribal, state, and United States Supreme Court cases regarding recusal to better understand the standard we would adopt for the Mohegan Court. I have gleaned from other courts some standards to be followed in reviewing similar motions. The guidance I turn to is that from the United States Supreme Court.
The Supreme Court stated impartiality is not gullibility. Disinterestedness is not childlike innocence ... ‘Partiality’ does not refer to all favoritism, but only to such as is, for some reason, wrongful or inappropriate. See, Liteky et al v. U.S., 510 U.S. 540, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994).
The Supreme Court also stated, in a concurring opinion, that a judge should be disqualified only if it appears that he or she harbors an aversion, hostility or disposition of a kind that a fair-minded person could not set aside when judging the dispute. The acquired skill and capacity to disregard extraneous matters is one of the requisites of judicial office. Id.
Disqualification is required if an objective observer would entertain reasonable questions about the judge’s impartiality. If a judge’s attitude or state of mind leads a detached observer to conclude that a fair and impartial hearing is unlikely, the judge must be disqualified. See, Sao Paulo State of ... Brazil v. American Tobacco Co., Inc., 535 U.S. 229, 122 S.Ct. 1290, 152 L.Ed.2d 846 (2002).
CONCLUSION
An appropriate standard would be, then: would an objective person look at the facts alleged by Mr. Eichelberg, Chairwoman Hamilton and me and.-observe a potential bias or prejudice towards a party which would give an appearance of impropriety?
One wouldn’t necessarily look at the issue before the Court as the controlling factor. In Laird v. Tatum, 409 U.S. 824, 93 S.Ct. 7, 34 L.Ed.2d 50 (1972), Chief Justice Rehnquist found no grounds to recuse himself in the fact situation in which as an Attorney General he provided expert testimony to the Senate on electronic surveillance; his statement included reference to the Laird case at its lower court status. Chief Justice Rehnquist then presided on the Laird case at the Supreme Court level.
In Sao Paulo State of Brazil v. American Tobacco Co., Inc., supra, The Supreme Court found that a district court judge did not have to recuse himself from hearing a case when as an attorney his name was listed on an amicus brief (although he didn’t know it at the time) in a similar case with some of the same defendants as the case he was involved in as the judge.
Here, it appears that the basis of the recusal motion is that almost one year ago, a nonparty related to a person who claims lack of personal jurisdiction over her by this Court overheard a discussion between me and Chairwoman Hamilton, who is now . a party, about matters that weren’t even in litigation at the time of the alleged conversation. Such matters have not yet been established as genuine issues *478 of the ease herein. We have not got that far yet.
I believe I am correct to state that an objective observer, ie. one who has no stake in the matter at hand, would not find impartiality [sic] nor an appearance of impropriety under these circumstances.
For these reasons, I DENY the Motion to Recuse.
It: is so ORDERED.

. Mohegan Law and Order Code, Title V, CODE or-JUDICIAL CONDUCT.

. Id., Chapter B. Canons of Conduct, Canon One. (B) A Judge Shall Promote Justice, Considerations

.Canon Two (A), A Judge Shall Promote and Protect the Independence of the Court, Principals.

. Canon Three (B)(5), A Judge Shall Always Exercise the Inherent Powers of the Court with Impartiality and Diligence, Considerations, Bias.

. The Court did inform the parties that it was granting Ms. Eiehelberg's Motion to Dismiss for Lack of Personal Jurisdiction, as well as dismissing the actions against the Mohegan Tribal Council and Chairman Mark Brown for the same reasons. The ruling on this Motion is being issued under a separate opinion order.

.Mr. Eiehelberg's last allegation goes again to his astonishment, which does not have relevance to the instant motion.